UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,  :    Civil Action No.:  CV 10-1742
                       Plaintiff,  :    Weinstein, J.

v.  :

  :

GRYPHON HOLDINGS, INC. d/b/a GRYPHON  :
FINANCIAL and GRYPHON DAILY,  :
KENNETH E. MARSH a/k/a "KENNETH  :
MASEKA," "MICHAEL WARREN" and  :
"MARCUS THORN," BALDWIN ANDERSON  :
a/k/a "BOLTON ANDERSON," ROBERT  :
ANTHONY BUDION a/k/a "BOBBY BUDION"  :
AND "ROBERT ANTHONY," JEANNE M. LADA  :
a/k/a "JEANNE GRECCO," and JAMES T.  :
LEVIER,  :

  :

              Defendants.  :

  :

           AND  :

  :

RICHARD BORRELLO, NICOLE MARSH,  :
GINNA MUNGIOVI, MICHAEL SCARPACI,  :
DOMINIC SPINELLI, and PAUL STOKES,  :

  :

        Relief Defendants.  :
-------------------------------------------------------------------X

**MEMORANDUM OF LAW OF DEFENDANTS KENNETH MARSH AND GRYPHON
HOLDINGS, INC. IN OPPOSITION TO MOTION TO DISQUALIFY COUNSEL**

## TABLE OF AUTHORITIES

**PAGES**

### Statutes

Article 6 of the New York Civil Rights Law, Section 60.................................................8

### Cases

*Application of Ellerby,* 99 Misc.2d 691, 416 N.Y.S.2d 968 (N.Y.C.Civ.Ct.1979).........................7

*Culebras Enterprises Corp. v. Rivera-Rios* 846 F.2d 94, 99-100 (1st Cir.1988)........................*4,5*

*Halligan,* 46 A.D.2d 170, 361 N.Y.S.2d 458 (4th Dept.,1974) ......................................8

*In Re Sakaris,* 610, N.Y.S. 2d 1007, 160 *Mics.* 2d. 657 (N.Y.Civ. Ct.. Richmond, 1993)............ 7

*Lamborn v. Dittmer,* 873 F.2d 522, 531 (2d Cir.,1989).................................................2

*Matter of Linda Ann A.,* 126 Misc.2d 43, 480 N.Y.S.2d 996 (Sup.Ct. Queens, 1984).................7

*Matter of Wing,* 4 Misc.2d 840, 157 N.Y.S.2d 333 ( N.Y. Civ. Ct, 1956)......................................8

*Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).............................. 2,4,5,6

*People v. Briggins,* 50 N.Y. 2d 302 ,428 N.Y.S. 2d 909 (1980)...................................................8,9

*Ramey v. District 141, Intern. Ass'n of Machinists and Aerospace Workers,*
378 F.3d 269, 283 (2d Cir. 2004)......................................................................................... 4

*Smith v. United States Cas. Co.,* 197 N.Y. 420, 90 N.E. 947 (1910)...........................................7,8

*United States v. Arrington,* 867 F.2d 122, 126 (2d Cir.1989).........................................................4

### Rules

Rule 3.7, *New York Rules of Professional Conduct* ........................................................ 1,3,5,6,13

### Texts

Ann., 49 A.L.R.2d 852; 2 Wharton, Criminal Law (Anderson ed., 1957), § 630).........................9

## TABLE OF CONTENTS

**SECTION**                                                                 **PAGE**

**INTRODUCTION** ...................................................................................   1

**DISCUSSION**.......................................................................................   1

    **I. There is absolutely no basis for the Government's Request
for a Curcio Hearing and no Basis for the Disqualification of Adorno &
Yoss, LLP**....................................................................................   1

    **II. The Government's Position That Kim Flotteron is Implicated
in the Crimes Alleged Against Marsh is Totally Unsubstantiated**...............   7

    **III. The Question of Paying for Anderson's Representation is Moot**.....   13

**CONCLUSION** ....................................................................................   14

## INTRODUCTION

A response to the Government's Memorandum in Support of the Government's Motion to Disqualify Counsel for, Defendants Kenneth Marsh ("Marsh") and Gryphon Holdings, Inc. ("Gryphon") (together, "Defendants") begins by an analysis of elements of the Government's positions:

1.  That there is a possibility that Marsh may raise an advice of counsel defense by Fred Schwartz, Esq. of Adorno & Yoss LLP calling one of the 263 attorneys at Adorno & Yoss LLP as a witness in the criminal action entitled United States of America v. Kenneth Marsh, et al., (the "Criminal Case"); and that, by implication, said defense may be prejudicial to Marsh. Thus the Government requests a Curcio hearing be held to advise Marsh of a "possible conflict."

2.  That Kim Flotteron, Esq. is personally implicated in the alleged crimes of the Defendants and must be disqualified; and that her firm, Jaffe & Falk, LLP, being a three-lawyer firm, has an unwaivable conflict.

3.  That there would be a potential, but waivable, conflict if the Court allowed Gryphon to pay Andrew J. Frisch a fee of $175,000 from the frozen funds to represent co-defendant Baldwin Anderson; and, therefore, a Curcio hearing would be required.

We will discuss these matters ad seriatim.

## DISCUSSION

### I.  There is Absolutely No Basis for the Government's Request for a Curcio Hearing and No Basis for the Disqualification of Adorno & Yoss LLP.

Despite the absence of any facts in support of disqualification of counsel pursuant to Rul e 3.7 of the *New York Rules of Professional Conduct*, the Government requests a Curcio hearing,

1

claiming there is a "possibility that Mr. [Jan Douglas] Atlas could be a witness" in the Criminal Case against Marsh, and that "Marsh is entitled to unconflicted legal advice on the merits of [an advice of counsel] defense." The Government's position is without any basis, as Marsh, through his counsel, has advised that he does not intend to use the advice of counsel defense in the Criminal Case. Accordingly, the possibility of a future potential conflict is non-existent, and no Curcio hearing is necessary.

"[M]otions to disqualify counsel…are subject to fairly strict scrutiny, particularly motions" under the witness-advocate rule. *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir.1989)). The party seeking to disqualify counsel "bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial." *Id.*

"Parties have a well-recognized and entirely reasonable interest in securing counsel of their choice." *Murray,* 583 F.3d at 180. Marsh has secured counsel for this matter and the Criminal Case. His selection of counsel may not be disturbed absent clear and convincing evidence that a conflict which presents a substantial likelihood of prejudice exists. See *Id.* at 178-79. The Government has clearly failed to meet that burden of demonstrating the likelihood of prejudice. In fact, a disqualification of A&Y would severely prejudice all the parties associated with both this and the Criminal Case. Should A&Y be disqualified, Marsh would be

2

forced to expend additional time and money in order to hire new counsel. Not only would this severely prejudice Marsh, but it would also prejudice the alleged "victims" for whose benefit Marsh's bank accounts have been frozen by the Securities and Exchange Commission ("SEC") in the instant case. Like A&Y, Marsh's new counsel would be forced to file additional motions and engage in further negotiations with the SEC in order to secure payment for any legal service performed on Marsh's behalf.

In support of its baseless attempt to hold a Curcio hearing, the Government relies upon Rule 3.7 of the *New York Rules of Professional Conduct*, also known as the advocate-witness rule, which provides:

> (a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
>    (1) the testimony relates solely to an uncontested issue;
>    (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
>    (3) disqualification of the lawyer would work substantial hardship on the client;
>    (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
>    (5) the testimony is authorized by the tribunal.
>
> (b) A lawyer may not act as advocate before a tribunal in a matter if:
>    (1) another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client; or
>    (2) the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9.

N.Y.R. Prof'l Conduct § 3.7.

The Government implies there is a potential conflict by imputation. See *N.Y.R. Prof'l*

3

*Conduct* § 3.7(b). "[D]isqualification by imputation should be ordered sparingly." *Murray*, 583

F.3d at 178. A law firm may "be disqualified by imputation only if the movant proves by clear

and convincing evidence that [A] the witness will provide testimony prejudicial to the client, and

[B] the integrity of the judicial system will suffer as a result." *Id.* at 178-79. Plaintiffs seeking

disqualification under Rule 3.7(b) must make a considerably higher showing of prejudice than

would be required under Rule 3.7(a). *Id.* at 179.

   "The advocate-witness rule applies, first and foremost, where the attorney representing

the client before a jury seeks to serve as a fact witness in that very proceeding." *Ramey v.*

*District 141, Intern. Ass'n of Machinists and Aerospace Workers,* 378 F.3d 269, 282 (2d Cir.

2004); see also Murray, 583 F.3d at 178 ("[T]the concerns motivating Rule 3.7 are attenuated

where...the witness-'advocate' is not someone who will be trying the case to the jury."). In

*Ramey,* the Second Circuit addressed the concerns implicating the advocate-witness rule, stating:

The concerns implicating the rule are that (1) the lawyer will appear to vouch for his own

credibility, (2) the lawyer's testimony will put opposing counsel in a difficult position when he

has to vigorously cross-examine his lawyer-adversary and seek to impeach his credibility, and (3)

there may be an implication that the testifying attorney may be distorting the truth as a result of

bias in favor of his client. See *Culebras Enterprises Corp. v. Rivera-Rios,* 846 F.2d 94, 99-100

(1st Cir.1988). Most important, when one individual assumes the role of both advocate and

witness it "[may] so blur[ ] the line between argument and evidence that the jury's ability to find

facts is undermined." *United States v. Arrington,* 867 F.2d 122, 126 (2d Cir.1989).

4

For the most part, these "concerns are absent or, at least, greatly reduced, when...the lawyer-witness does not act as trial counsel." *Culebras Enterprises Corp.*, 846 F.2d at 100. Id. at 282-83 (emphasis added). Mr. Atlas is not acting as Marsh's counsel in the Criminal Case and will not act as Marsh's advocate before a judge or jury. Accordingly, Rule 3.7 does not apply under the circumstances.

This case is analogous to *Murray v. Metropolitan Life Ins. Co.*, 583 F. 3d 173 (2d Cir. 2009), where the court refused to disqualify the defendant's counsel on the basis of the advocate-witness rule. The plaintiffs moved to disqualify counsel for the defendant on the basis that the defendant's counsel were going to give testimony adverse to the defendant at trial. *Id.* at 177. Specifically, there were four defense lawyers who were likely to testify at trial-none of whom would be acting as the defendant's advocates at trial. *Id.* at 179. The court found that there was insufficient evidence in the record to indicate that the defense attorneys' testimony would be sufficiently prejudicial to the defendant to warrant disqualification. *Id.* The court also found that the defendant's desire to keep its counsel "militate[d] strongly against a finding of prejudice." *Id.* at 180. Holding that "a law firm can be disqualified by imputation only if the movant proves by clear and convincing evidence that [A] the witness will provide testimony prejudicial to the client, and [B] the integrity of the judicial system will suffer as a result," the court concluded that the plaintiffs failed to prove that disqualification of the defendant's counsel was warranted under the circumstances. *Id.* at 178-79.

5

Like the court in *Murray,* this Court should find there is no basis to disqualify A&Y pursuant to the advocate-witness rule, especially because Marsh's counsel has advised the Government that Marsh has absolutely no intention of pursuing an advice of counsel defense at trial. Consequently, no attorney will provide testimony prejudicial to Marsh at trial in support of this defense, and the integrity of the judicial system cannot suffer as a result.

Finally, the Government's unexcused delay in bringing its motion to disqualify requires that the motion be denied. The Government has known the identity of Marsh's counsel for at least the past (2) months and at no time raised the issue of a potential conflict that might warrant disqualification of counsel. Instead, the Government waited until after Defendants engaged in lengthy negotiations and motion practice in connection with a motion to release funds from Defendants' frozen assets filed by Defendants in the instant case, to file its motion. The Government's delay in filing this motion "suggests opportunistic and tactical motives, magnifies the harms to the judicial system that already inhere in any disqualification by imputation, abuse the expectations of jurors, and has the general tendency to impair rather than promote confidence in the integrity of the judicial system." See *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 180 (2d Cir. 2009).

Since there is clearly no conflict pursuant to Rule 3.7, this Court must deny the Government's request for a Curcio hearing. However, even if there were a potential conflict that would render a Curcio hearing necessary, the Government is unable to meet its burden of proving that Marsh's counsel will provide testimony that would be prejudicial to Marsh at trial.

6

Accordingly, there is no basis to disqualify A&Y as Marsh's counsel.

## II.   The Government's Position That Kim Flotteron is Implicated in the Crimes Alleged Against Marsh is Totally Unsubstantiated.

The Government's claims against Kim Flotteron are unsubstantiated and untrue. However, even if they were true, such claims are inadequate to state a criminal complaint against Ms. Flotteron, are inadequate to require her disqualification and are plainly designed to separate Marsh from his trusted legal representatives.

First of all, we note that although the Government insists that Marsh's longstanding use of the assumed surname "Maseka" constitutes reference to a fictitious individual, the Government has overlooked or intentionally ignored the longstanding and frequently reported common law and New York rule that anyone can assume any name he or she desires, with or without court approval, as long as it is not intended to be used for fraud, and that the use of that name is not reference to a fictitious person, but to an alternative name for the same person. *In Re Sakaris,* 610 N.Y.S. 2d 1007, 160 *Misc.* 2d. 657 (N.Y. Civ. Ct., Richmond County, 1993). For example, well-known individuals such as Pope Benedict, Cary Grant, Bob Hope, Jack Benny, Mohammed Ali, and the entertainer formerly known as Prince have all assumed alternative names.

In *Sakaris*, Judge Maltese accurately stated that:

"Under common law, a person is free to assume any name he or she chooses, in the absence of fraud, misrepresentation or interference with the rights of others, *Smith v. United States Cas. Co.,* 197 N.Y. 420, 90 N.E. 947, *Matter of Linda Ann A.,* 126 Misc.2d 43, 480 N.Y.S.2d 996 [Sup.Ct. Queens 1984]. No judicial proceeding is necessary to change a name; it can be made effective through simple usage or habit, *Matter of Halligan,* 46 A.D.2d 170, 361 N.Y.S.2d 458. See also, *Application of Ellerby,* 99 Misc.2d 691, 416 N.Y.S.2d 968 [N.Y.C.Civ.Ct.1979]."

7

Judge Maltese further determined that in addition to the common law method, there is a parallel court procedure outlined in Article 6 of the *New York Civil Rights Law* (CRL) under which an individual may change his or her name.  See CRL § 60.  While an individual is permitted to adopt a new name simply by using it, such usage is conditioned upon its use being innocent of fraud, deceit or to avoid a just obligation.  CRL § 60 does not diminish an individual's common-law right to select an appropriate name.

In *Matter of Halligan*, 46 A.D.2d 170, 361 N.Y.S.2d 458 (4th Dept.1974), the Appellate Division noted:

> "Under the common law a person may change his or her name at will so long as there is no fraud, misrepresentation or interference with the rights of others (*Smith v. United States Cas. Co.*, 197 N.Y. 420, 428-429, 90 N.E. 947; *Matter of Wing,* 4 Misc.2d 840, 157 N.Y.S.2d 333.. The statute affirms this right and the two procedures exist side by side supplementing each other...."

*People v. Briggins*, 50 N.Y. 2d 302 ,428 N.E. 2d 909 (1980) also dealt with alternative names in the context of a criminal litigation. The court dealt with a convicted individual, Mr. Briggins, who had obtained a temporary motor vehicle operator's license, applied for a permanent driver's license driver's license, opened a checking account and issued checks as "Garry Morriss", an assumed name. When he issued checks on that account to pay for a purchase, the discrepancy between his assumed and family name was discovered, he was arrested, and an overzealous prosecutor, as in the current situation, brought criminal charges on a variety of theories, including possession of forged documents.  The Court of Appeals reversed the conviction and dismissed the indictment, stating that:

> "In signing the name Garry Morris, however, the defendant did not simulate, alter, erase

8

or obliterate someone else's signature. Instead, in handwriting that was undisguised, he merely used his adopted name, as a Samuel Clemens may have used the name Mark Twain or a Mary Ann Evans that of George Eliot. Nor did he do anything directly or indirectly to suggest that anyone but he was the "ostensible" signer and applicant or, for that matter, that the name Garry Morris was other than his own. In short, he did nothing that would cause one who relied on the instruments to believe that Garry Morris was the name of someone else, real or "fictitious". Rather, he was unswerving in painting himself as the "ostensible maker or drawer". Nevertheless, the People, insisting that the name Garry Morris must be regarded as "fictitious" within the intendment of the statute, would have us hold that defendant's position is indistinguishable from that of one who has counterfeited a signature. Neither the history of the common law of forgery nor the logic of its present statutory formulation supports this argument."

"The forged character of a document does not depend so much on whether it contains a falsehood, but on whether, on its face, it misrepresents its authenticity. To illustrate, suppose one other than the owner of real property unauthorizedly affixes the latter's signature to a conveyance of title. The false signature then constitutes the deed a forgery since it, at least impliedly, represents that the instrument is genuine....
"That is not to say that the signing of one's own name to an instrument cannot be a forgery. While generally it is not illegal per se to adopt an alias or a nom de plume, freedom to do so reaches its limits when the practice is accompanied by a fraudulent design (see Ann., 49 A.L.R.2d 852; 2 Wharton, Criminal Law (Anderson ed., 1957), § 630).

****

"While the name Garry Morris was fictitious in the sense that it was not the one the defendant received at birth, in none of the dealings described at trial did he ever seek to disassociate himself from it or to deny that he was the person to whom it referred. And, whatever the benefit or convenience he believed its use afforded him, there is no showing that he employed it as an instrument with which to unfairly impose on others. In other words, given the law's general acquiescence in the use of an alter idem, be it for business, professional, theatrical or personal reasons, we cannot conclude that defendant's consistent representation that the assumed name was his own manifested any "intent to defraud, deceive or injure another" .... From all this we do not imply that a fraudulent use of a fabricated identity i. e., a misrepresentation that a fictitious name refers to someone other than its creator could not sustain a conviction for forgery, or, as charged here, possession of a forged instrument. Rather, we simply hold defendant's conduct was devoid of that character."

"This analysis does not depend on a hypertechnical consideration of the statutory language. The distinction between a fictitious name and a fictitious person is one well recognized by legal scholars (citation omitted)"

****

"In sum, the proof in this case was insufficient to establish that the motor vehicle credentials which defendant applied for and obtained under his assumed name were

9

forgeries. Accordingly, respect for the fundamental principle that a person cannot be found criminally liable for conduct which does not constitute a crime compels reversal of the order of the Appellate Division and dismissal of the indictment"

There is no factual dispute, and Ken Marsh never denied, that he was also known as Ken Maeska. In fact it was he who, about six months before this litigation and the companion criminal litigation began, (and more than 4 months before the State Court litigations began) voluntarily and freely advised the U.S. Attorney's Office as well as the SEC of that alternative name. Thus the alternate names were never a secret. Moreover there is not the slightest evidence presented by the Government in support of its motion that Ms. Flotteron knew of the Government's unsubstantiated claims that the alternate name were being used for improper purposes. At best, it is the Government's fascinating but incredible position that she should have learned of those claims by osmosis, while she was gathering evidence for totally unrelated business and matrimonial litigations. Moreover, even if she had suspected or known of Marsh's use of alternative names, there was and still is no evidence that Ms. Flotteron knew or should have known that the use of those names (claims which are distinct, for the moment, from the claims of exaggerated educational and business experience) was fraudulent.

Plainly, this outrageous motion is yet another attempt by the government to distort the facts, handcuff the Marsh and disassemble the team of lawyers with whom he is comfortable and who are working arduously to defend him from the unsubstantiated allegations brought against him. Moreover, the government's allegations, in addition to being unsubstantiated, are demonstrably false and misleading, in both minor and major respects.

10

First, the government falsely claims that Ms. Flotteron served as Marsh's divorce attorney in an action that was filed months before April, 2010. However, as they know, or should have known, the divorce was not instituted (although it was being discussed) until April 8, 2010. (See copy of Summons with Notice filed on April 8, 2010 attached hereto as Exhibit "A"). Even the civil action on behalf of Gryphon Holdings, Inc. against former employees of Gryphon, alleging claims of misappropriation of funds, breach of duty of loyalty, unfair competition, misappropriation of trade secrets, conversion, trade secrets, and tortuous interference with present and prospective economic advantage, was not filed until March 26, 2010, and not, as the Government would have it, months before April, 2010 (See Complaint in an action entitled Gryphon Holdings, Inc. v. Nicole Desposito Marsh et al. Supreme Court, Richmond County Index No.: 100663/10 attached as Exhibit "B").

Second, any office visits made by Ms. Flotteron to Gryphon Holdings, Inc., were made solely to gather facts and interview personnel and take client and employee statements in connection with the civil action. Although Ms. Flotteron was involved in the settlement of the matrimonial action, she only acted as second chair to Marsh's lead divorce attorneys, Cantor, Coscia & Schustal LLC.

Third, the Government does not submit any affidavits or other evidence in support of the statements made by C-1 and C-2. (Plainly, C-1 and C-2 are known to Ms. Flotteron since she interviewed them, and prepared and filed their affidavits.) Rather, the Governments includes its "own" conjured up and unsupported factual claims in their memorandum of law.

11

Fourth, as to witness C-1, the Government states on page 5 of its memorandum that according to C-1:

"Ms. Flotteron told C-1 that "Greg Lehman" was a fake name, and that Lehman's real name was on the lawsuit. C-1 also stated that Ms. Flotteron avoided stating what Lehman's real name was."

However, for obviously manipulative reasons known only to the Government, it did not include with its motion a copy of the revised affidavit signed by C-1 that was actually filed in the State Court civil action. Instead, it filed a preliminary draft that was changed by Ms. Flotteron after consultation with C-1 before it was filed to specifically mention that Greg's Lehman's real name was Gregory Rossamondo. (See Copy of Affidavit of Arnold Edwards attached hereto as Exhibit C). Plainly, Ms. Flotteron made no attempt to conceal that the original family name of Mr. Lehman was Rossomando.

Fifth, C-2 was specifically advised that Ms. Flotteron was representing Gryphon Holdings, Inc. and that Michael "Stern's " family name was "Scarpaci". In fact, paragraph 2 of C-2's affidavit evidences C-2's knowledge of the assumed name. (See Affidavit of C-2 attached hereto as Exhibit "D"). No Mention of "Maeska" or any other owner of Gryphon was ever made in that conversation, although there was no reason at all to conceal the fact that Mr. Marsh also has an assumed family name of Maseka.

Finally, as is the case with Mr. Atlas, Ms. Flotteron will not be serving as lead counsel in

12

this litigation. Rule 3.7, which the government cites as the basis of her disqualification, even if applicable, only precludes a lawyer-witness from participating as trial counsel. Nothing prevents her from assisting lead counsel, conducting depositions, arguing motions, or engaging in any other pre-trial activities. Also, the bar on participation of the attorney applies only to the individual lawyer who will be a witness, and generally does not apply to other members of that lawyers firm. And finally, among the exceptions to the rule is a broad one for a party who would otherwise suffer "substantial hardship" by being deprived of counsel of his choice.

The Government's motion is an obvious attempt to use of a common government tactic to threaten counsel into submission and to create enough "smoke and mirrors" to deny Marsh his constitutional right to right to use counsel of his choice. They should be ashamed, and the motion should be denied.

**III.   The Question of Gryphon paying for Anderson's representation is Moot.**

Gryphon was willing to pay $175,000 for the defense of Anderson from frozen funds. This was of course subject to an explicit conversation with Mr. Frisch that payment by Gryphon would not in any way compromise his independence. However, the negotiations with the SEC early on excluded the possibility of reaching a stipulation to allow for such a payment. Therefore, the requested payment has been abandoned and the issue is moot.

**CONCLUSION**

The US Attorney's motion is an obvious attempt to use of a common government tactic

13

to threaten counsel into submission and to create enough "smoke and mirrors" to deny Marsh his constitutional right to right to use counsel of his choice. They should be ashamed, and the motion should be denied.

Respectfully submitted,
Falk and Associates, LLC

By _____ by Kristen Lam Cardoso

Kenneth B. Falk, Esq. (KB6547)

Adorno & Yoss, LLP

By: _____

Jan Douglas Atlas, Esq.

14

# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

Index No.: 050323/10

Date Summons filed: 4/8/10

Plaintiff designates RICHMOND
County as the place of trial
The basis of venue is:

Plaintiff's Residence

----------------------------------------------------------------X

KENNETH E. MARSH,

                                    Plaintiff,

        -against-

NICOLE MARSH,

                                    Defendant.

**SUMMONS WITH NOTICE**
Plaintiff/Defendant resides:

12 Hartford Street
Staten Island, NY 10308

----------------------------------------------------------------X

**ACTION FOR DIVORCE**

To the above named Defendant:

        **YOU ARE HEREBY SUMMONED** to serve a notice of appearance on the Plaintiff/Plaintiff's Attorney(s) within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded in the notice set forth below.

Dated: 04/07/10

                                    FALK & ASSOCIATES, LLC
                                    Attorney(s) for Plaintiff
                                    Address:        843 Rahway Avenue
                                                        Woodbridge, NJ 07095
                                    Phone No.:     (732) 877-1500

**NOTICE:**        The nature of this action is to dissolve the marriage between the parties, on the grounds:
                        **DRL Sec. 170 subd. (1) Cruel & Inhuman Treatment and (2) Constructive Abandonment.

The relief sought is a judgment of absolute divorce in favor of the Plaintiff dissolving the marriage between the parties in this action. The nature of any ancillary or additional relief demanded is:

Equitable distribution of the marital assets; exclusive possession of the marital residence; custody of the infant issue; child support; health & life insurance; maintenance; attorney's fees; and for such other and further relief as this Court may deem just and proper;

**Insert the grounds for the divorce:            RECEIVED COURT DESK
DRL Sec. 170(1) – cruel and inhuman treatment      DRL Sec. 170(4) – adultery
DRL Sec. 170(2) – abandonment                            DRL Sec. 170(5) – living apart one year after judgment of separation
DRL Sec. 170(3) – confinement in prison               DRL Sec. 170(6) – living apart one year after execution of a separation
                                                                                agreement
                                                RICHMOND COUNTY CLERK

# Exhibit "B"

STATE OF NEW YORK
SUPREME COURT: COUNTY OF RICHMOND

---

GRYPHON HOLDINGS, INC.

                Plaintiff

  vs.

NICOLE DESPOSITO MARSH, GENESIS
RESEARCH, INC., PARAGON INFORMATION
SERVICES, LTD., MICHAEL SCARPACI,
LISA M. ATKINS, MICHELE CLARK, ANNA E.
DORIA, JOANNA L. ERNST, JESSICA
HANDELMAN, LISA GURRIERA,
CHRISTOPHER PERROTTA, PAUL STOKES,
MARISA MATARAZZO, VANESSA XUERUB,
ROBERT SEIDOR, ROBERT BUDION,
ANTHONY DELLAVENTURA,
GREGORY ROSSOMANDO,
And FRANCESCA ALAIMO

                Defendants.

INDEX NO.: 100663/10

**AMENDED
VERIFIED COMPLAINT**

*RECEIVED COURT DESK*
*2010 MAR 26  A 9 23*
*RICHMOND COUNTY CLERK*

---

      The plaintiff, by its attorneys, Jaffe & Falk, LLC, for its complaint against the defendants alleges upon information and belief as follows:

## PARTIES

      1.  Plaintiff is a corporation duly organized and existing under and by virtue of the laws of the State of New York with offices located at 3767 Victory Boulevard, Suite C, Staten Island NY.

      2.  Kenneth Marsh ("Marsh") is the sole shareholder of the Plaintiff.

      3. Defendant, Nicole Desposito Marsh, ("Desposito") was an employee and Chief Executive Officer of Plaintiff, with a residence at 78 Florence Place, Staten Island, New York. She is also the estranged wife of Marsh.

      4. On information and belief, defendant, Genesis Holdings, Inc., ("Genesis") is the corporation organized by defendant, Desposito, to carry out and promote defendant, Desposito's personal and business interests and to compete with the Plaintiff.

5. On information and belief, Paragon Information Services, LTD ("Paragon") is an entity organized by the defendants, Desposito and defendant, Michael Scarpacci.

6. Defendant, Michael Scarpaci ("Scarpaci") was an employee of the Plaintiff, employed as a salesman, having a residence at 7 Helene Court, Staten Island, NY 10309.

7. Defendant, Lisa M. Atkins ("Atkins") was an employee of the Plaintiff employed as a secretary having a residence at 446 Barlow Avenue, Staten Island, NY 10308.

8. Defendant, Michelle Clark ("Clark") was an employee of Plaintiff employed as a writer, having a residence at 1486 Bedford Avenue, Apt 1C, Brooklyn, NY 10001.

9. Defendant, Anna E. Doria ("Doria") was an employee of Plaintiff employed as secretary, having a residence at 405 Jefferson Avenue, Staten Island, NY 10306.

10. Defendant Joanna L. Ernst ("Ernst") was an employee of Plaintiff employed as writer, having a residence at 1486 Bedford Avenue, Apt 1C, Brooklyn, NY 11216.

11. Defendant, Jessica Handelman ("Handelman") was an employee of Plaintiff employed as a secretary and computer specialist, having a residence at 119 Matthews Road, Swanzey, New Hampshire 03446.

12. Defendant, Lisa Guerriera ("Guerriera") was an employee of the Plaintiff employed as a secretary, having a residence at 70 Stephen Loop, Staten Island, NY 10314.

13. Defendant, Christopher Perrotta, ("Perrotta") was an employee of Plaintiff employed as a salesman, having a residence at 531 Rockaway Street, NY 10307.

14. Defendant, Marisa Matarazzo ("Matarazzo") was an employee of Plaintiff employed as a secretary having a residence at 137 Midland Road, Staten Island, NY 10308.

15. Defendant, Paul Stokes ("Stokes") was an employee of the Plaintiff employed as a salesperson having a residence at 313 Bryson Avenue, Staten Island, NY 10314.

16. Defendant, Vanessa Xuerub ("Xuerub") was an employee of the Plaintiff employed as a secretary having a residence at 134 Carlyle Green, Staten Island, NY 10314.

17. Defendant, Robert Seidor ("Seidor") was an employee of the Plaintiff employed as a salesperson having a residence at 219 Winding Woodloop, Staten Island, NY 10307.

18. Defendant, Anthony Dellaventura ("Dellaventura") was an employee of the Plaintiff employed as a sales person having a residence at 305 Poillon Avenue, Staten Island, NY 10309.

19. Defendant, Gregory Rossomando ("Rossamondo") was an employee of the Plaintiff employed as a salesperson, having a residence at 379 Grantwood Avenue, Staten Island, NY 10312.

20. Defendant, Robert Buidon ("Buidon") was an employee of the Plaintiff employed as a salesperson, having a residence at 73 Wainwright Avenue, Staten Island, NY 10312.

21. Defendant Francesca Alaimo ("Alaimo") was an employee of the Plaintiff employed as a writer, having a residence at 29 Joan Place, Staten Island, NY 10314.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

22. Plaintiff is in the business of creating, supplying, and distributing financial newsletters and commercial advertisements (the "products") to customers who subscribe to the company's products through monthly or yearly paid subscriptions. Plaintiff's business consists of approximately 30 employees.

23. Plaintiff services and supports thousands of customers who use these products.

24. In order to effectively compete in the industry, Plaintiff has invested a substantial sum in the development of these products and its customer lists, including expending millions of dollars on the rental and purchase of leads.

25. Plaintiff has invested a substantial amount of time and money to develop and maintain information on and relationships with its customers. These banks of information consist of, among other things, customer lists, company sales reports, marketing and selling plans, account status reports, customer product histories, customer business plans of operations, information concerning sales representatives, product lists, product cost data, financial data, and suppliers and services, and contain confidential information concerning the identity of plaintiffs customers and the customer's ordering habits, purchasing objectives, plaintiffs profit margins and plaintiffs method of doing business (the "confidential customer information"). The banks of information are not available from any other source other than the confidential customer information.

26. Plaintiff does not disclose its customer information outside of its company but, instead treats the confidential customer information as a trade secret.

27. The confidential customer information is a trade secret and has substantial economic value both actual and potential. This information is not known to other persons who, if had the information, could obtain economic value from its disclosure or use.

28. The confidential customer information is the subject of efforts that are reasonably designed to maintain its secrecy or confidentiality, such as requiring its employees to enter into confidentiality agreements and by implementing security measures providing only limited access to the confidential customer information.

29. Plaintiff requires its employees who have access to confidential information to maintain the confidentiality of the information.

30. Plaintiff's employees understood and were required to maintain and protect Plaintiff's trade secrets.

31.  Desposito was an employee, Officer and Director of the Plaintiff.  Desposito was employed by the Plaintiff as a bookkeeper and office administrator. In this capacity, Desposito, undertook a position of trust and authority.

32. In her capacity as a bookkeeper of Desposito had access to the Plaintiffs business checking for the purposes of conducting business activities.

33.  On March 17, 2010, Desposito made an unauthorized transfer from Plaintiffs business checking account at Wachovia Bank ("business checking account") in the sum of Thirty-Thousand Dollars ($30,000). (See copy of check attached hereto as Exhibit A)

34.  On March 18, 2010, Marsh learned of the transfer and approached Deposito concerning the nature of these transactions. Desposito did not provide Marsh with an explanation.

35.  Marsh thereafter revoked Desposito's authority to issue any checks from the business checking account.

36.  Thereafter, on March 19, 2010, Marsh attempted to log into the business checking account via Wachovia Bank's on-line banking system, however he was unable to log-on because Desposito's changed the passwords on the account.

37.  Immediately thereafter, Marsh went to the Wachovia Bank branch location with defendant, Scarpaci, where he was informed that Desposito made two additional unauthorized transfers to herself from the Wachovia business checking account by forging Marsh's signature on:

> a)  March 9, 2010, in the amount of Thirty-Thousand Dollars ($30,000) (See Copy of Check attached hereto as Exhibit B). and
>
> b)  March 17, 2010, in the amount of Two-Hundred and Fifty Thousand Dollars ($250,000) to an HSBC account. (See copy of check attached hereto as Exhibit C).

38. Thereafter, Marsh tried to log into the Plaintiffs website's back-end system where all the Plaintiffs proprietary and confidential customer information is stored.  However, Marsh was locked out of the system since Desposito changed all the passwords, preventing Marsh from conducting business operations.

39. Marsh immediately called the website developer of the company's website to help him log back in and was by the website developer that while Desposito was employed by Plaintiff she called the developer to help her start a new web-site.

40. On Monday, March 22, 2010, when Marsh returned to the office he noticed that two computers from Plaintiffs office were missing and stolen.  One computer was Plaintiff's main-frame computer system that all of the other computers worked off of and which contained Plaintiffs confidential customer information and proprietary information. The other computer contained all of Plaintiff's advertisements and work-products.

41. Upon information and belief, the Defendants stole the two computers.

42. Also, when Plaintiff returned to the office on March 22, 2010, he learned that Desposito, Scarpaci, Atkins, Clark, Doria, Ernst, Handelman, Gurriera, Perrotta, Matarazzo, Stokes, Xuerub, Seidor, Dellaventura, Rossomando, Buidon, and Alaimo (collectively the "Defendants") had quit.

43. Upon information and belief, a meeting was held at the home of Scarpaci to inform the other Defendants that a new office location was secured whereby business operations similar to that of Plaintiff would be operated.

44. Upon and information and belief, the Defendants conspired to steal Plaintiff's confidential customer information and proprietary information in order to form a similar business while the Defendants were employed by Plaintiff and during normal business hours.

45. Upon information and belief, the Two-Hundred and Fifty Thousand Dollars ($250,000) that Desposito illegally transferred from Plaintiff's business checking account to herself on March 17, 2010, was thereafter transferred to another account HSBC in the name Paragon Information Services, LTD, which is held 50% by defendant, Desposito and 50% by defendant, Scarpaci.

46. Upon information and belief, Deposito and Scarpaci, have partnered together to form an entity ("new entity") to compete with the Plaintiff and completely put Plaintiff out of business operations.

47. On information and belief, while the Defendants were employed by the Plaintiff during regular business hours, within the use of the Plaintiff's resources the Defendants were actively competing with the Plaintiff by a) soliciting customers of the Plaintiff to end their relationship with the Plaintiff and follow Defendants to the new business entity; b) soliciting other employees of the Plaintiff to end their relationship with the Plaintiff and follow Defendants to the new business entity; c) diverting corporate business opportunities by advising customers of the Plaintiff to cancel their credit card subscriptions with the Plaintiff and join with the new business entity; and d) falsely informing clients that Plaintiff was going out of business and that the Defendants would call them to start to new memberships at the new business entity when it was up and running.

48. Upon information and belief, the Defendants are continuing to use Plaintiff's confidential customer information, trade secrets, and proprietary information to conduct business operations at the new entity and to compete with the Plaintiff.

49. Upon information and belief, the Defendants are continuing to solicit Plaintiff's customers to subscribe with the new entity.

50. Upon information and belief, the Defendants are providing false, misleading and deceptive statements of fact about the quality of Plaintiff's products and financial condition, and the character and business ethics of Plaintiffs officers and directors, in order to mislead customers and others to cancel their subscriptions with Plaintiff and to transfer them to the new entity.

51. Upon information and belief, Defendants have hacked into Plaintiff's computer system and changed Plaintiff's passwords to his computer system so that he cannot operate business, erased customer names and telephone numbers, and erased advertisements and newsletters from Plaintiff's computer database.

52. Upon information and belief, Defendants have tried to change the password on Marsh's email account so that he cannot enter the account and conduct business operations. (See copy of Gmail letter dated March 25, 2010, attached hereto as Exhibit D)

53. Defendants conspired, planned, and arranged for the theft of the Plaintiff's confidential customer information, proprietary information, and employees while working for Plaintiff and having a duty of good faith and loyalty to the Plaintiff.

54. Defendant, Desposito, conspired, planned, and arranged for the theft of the Plaintiff's business assets, confidential customer information, proprietary information, and employees while she was an Officer and Director of Plaintiff having a fiduciary duty of good faith and loyalty to the Plaintiff.

55. The Defendants have engaged and continue to engage in an unlawful campaign designed to solicit employees and customers from Plaintiff by; (a) stealing plaintiffs customer lists and other trade secrets, including, but not limited, confidential and proprietary information related to further development of plaintiffs products ("confidential development information"),(b) stealing over $310,000 from Plaintiff and (c) commencing a nationwide solicitation campaign directed to Plaintiffs current customers by providing false and misleading statements.

56. In the course of this campaign, defendants have stolen confidential and proprietary information and trade secrets from plaintiff and has incorporated them into their sales and marketing program.

### FIRST COUNT
(Unfair Competition)

57. Plaintiff repeats the allegations contained in paragraphs 1 through 56.

58. During the course of her employment with Plaintiff, Defendants, had access to and obtained Plaintiff's confidential customer information, which Defendants were obligated not to disclose without Plaintiffs prior consent.

59. Defendants, by improper and unlawful means, including the use of Plaintiffs confidential customer information and confidential development information, have committed acts of unfair competition against Plaintiff

60. Defendants have also interfered with Plaintiffs current and prospective customers by defaming Plaintiff and publishing false information to Plaintiffs customers and business associates about Plaintiff's financial status.

61. Defendants have used stolen information from Plaintiff to attempt to service former customers of plaintiff.

62. By virtue of these actions, plaintiff has sustained damages and will continue to sustain damages.

## SECOND COUNT
(Unjust Enrichment)

63. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First Count.

64. Defendants have been unjustly enriched by the profits they have made through their theft of confidential information and proprietary information belonging to Plaintiff and from the proceeds produced therefrom.

65. To allow Defendants to retain such sums would be unjust.

## THIRD COUNT
(Misappropriation of Trade Secrets)

66. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First and Second Counts.

67. Defendants have wrongfully misappropriated, threatened to use and actually have used valuable confidential information and trade secrets belonging to plaintiff, including but not limited to, confidential development information and confidential customer information, including customer lists.

68. Plaintiff has suffered damages as a result of Defendants acts and omissions and will continue to suffer damages.

### Fourth Count
(Conversion)

69. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First, Second and Third Counts.

70. Defendants converted plaintiff's property by stealing confidential and proprietary information belonging to Plaintiff for the use and benefit of Defendants.

71. By virtue of these actions, Plaintiff has suffered damages and will continue to suffer damages.

### FIFTH COUNT
(Embezzlement)

72. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First, Second, Third and Fourth Counts.

73. Defendant, Desposito and  Scarpaci conspired to steal Plaintiff's property by missapropriating the sum of approximately $310,000 from the Plaintiff's checking account.

74. By virtue of these actions Plaintiff has suffered damages.

### SIXTH COUNT

(Tortious Interference with Present and Prospective Economic Advantage)

75. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First, Second, Third, Fourth, and Fifth Counts.

76. Defendants have tortiously interfered with Plaintiff's present and prospective economic advantage by intentionally and wrongfully utilizing the confidential customer information for their own benefit and for the benefit of Plaintiff competitors.

77. Defendants have tortiously interfered with Plaintiff's present and prospective economic advantage by intentionally and wrongfully soliciting Plaintiff's customer base from the information that defendants stole from Plaintiff.

78. As a result of Defendants interference with Plaintiffs present and prospective economic advantage Plaintiff has lost and will continue to lose substantial business from existing and prospective customers.

79. By virtue of Defendants' tortuous interference with Plaintiff's present and prospective economic advantage, Plaintiff has sustained damages and will continue to sustain damages.

## SEVENTH COUNT

### (Violation of Lanham Act)

80. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First, Second, Third, Fourth, Fifth, and Sixth Counts.

81. Defendants are persons who, in connection with plaintiff's products, have used interstate commerce false and or misleading descriptions of fact and false and misleading representations of fact which: (a) are likely to cause confusion, or to cause mistake, or to deceive customers as to Plaintiffs commercial activities; and to (b) misrepresent the nature, characteristics and qualities of Plaintiff products and commercial activities.

82. As a direct and proximate result of Defendant's wrongdoing, Plaintiff has sustained irreparable harm and damage and will continue to sustain irreparable harm and damage.

## EIGHTH COUNT

### (Trade Disparagement)

83. Plaintiff repeats the allegations contained in paragraphs 1 through 56 and the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Counts.

84. Defendant's false statements of fact, published with malice and with the intent to injure Plaintiff and its reputation for quality of products and services, financial stability, and the like constitute trade libel, trade disparagement, and defamation, as a direct result of which Plaintiff has sustained and will sustain special damage.

85. As a further and proximate result of Defendant's wrongdoing, Plaintiff has sustained irreparable harm and damage and will continue to sustain irreparable harm and damage.

## NINTH COUNT

### (Breach of Fiduciary Duty-Self Dealing and Duty of Loyalty)

86. Plaintiff repeats the allegations contained in paragraphs 1 through 26 and the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Counts.

87. By virtue of their employment by Plaintiff, Defendants owed Plaintiff a fiduciary obligation to act in good faith on behalf of Plaintiff and owed a duty of loyalty to the Plaintiff

88. Defendant, Desposito, as an Officer and Director of Plaintiff has a contuining duty of loyalty to the Plaintiff and breached her fiduciary obligations owed to Plaintiff by wrongfully utilizing the confidential information for her benefit and conspiring to commit said breaches while an employee of Plaintiff.

89. As a result of Defendant, Despositos, breach of her fiduciary obligation Plaintiff has suffered damages and will continue to suffer damages.

**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows:

(a) Requiring that Defendants, Desposito and Scarpaci, return to Plaintiff all unauthorized monies they transferred from Plaintiff's business checking account i.e in the sum of $310,000;

(b) Restraining and enjoining Defendants from disclosing, making use of, or otherwise disseminating any of Plaintiff's trade secrets including but not limited to confidential customer information and proprietary information; and requiring an accounting of all such disclosures, uses and disseminations of Plaintiff trade secrets and property;

(c) Restraining and enjoining Defendants from communicating with any of the present or former customers of the Plaintiff; and

(d) Requiring that Defendants return to plaintiff any confidential customer information, trade secrets and all copies of Plaintiffs customer database or other trade secrets belonging to plaintiff in their possession, dominion; or control; and

(e) Prohibiting the Defendants from competing with the Plaintiff in any respect;

(f) Requiring Defendants to account for and pay over to Plaintiff all of the Defendants receipts and income; and

(g) Restitution of the amounts unjustly obtained and retained by Defendants;

(h) compensatory damages;

(i) Incidental damages;

(j) Punitive Damages

(k) Attorney Fees; and

(l) such other relief as the Court deems just and proper.

**JAFFE & FALK, LLC**
*Attorneys for Plaintiff*

By: _____
Kim M. Figueroa

## VERIFICATION

I am the President and sole shareholder of the Plaintiff, Gryphon Holdings, Inc. named in the foregoing complaint.   I have read the foregoing complaint and on my own personal knowledge certify and verify that the allegations thereof are true.   I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

Kenneth Marah

Dated: March 24, 2010

Sworn to me this 24th day of March 2010

Notary Public

Kim Flotteron
Notary Public State of NY
Qualified in Richmond County
Comm.# 02FL6181671
My Commission Expires on 2/04/2012

# EXHIBIT "C"

**STATE OF NEW YORK**
**SUPREME COURT: COUNTY OF RICHMOND**

---

GRYPHON HOLDINGS, INC.                          :
                                                :
                                                :
                          Plaintiff             :          INDEX NO.: 100663/10
                                                :
           vs.                                  :
                                                :
NICOLE DESPOSITO MARSH, GENESIS                 :
RESEARCH, INC., PARAGON INFORMATION             :
SERVICES, LTD., MICHAEL SCARPACI,               :
LISA M. ATKINS, MICHELE CLARK, ANNA E.          :          **AFFIDAVIT OF**
DORIA, JOANNA L. ERNST, JESSICA                 :          **ARNOLD EDWARDS**
HANDELMAN, LISA GURRIERA,                       :
CHRISTOPHER PERROTTA, PAUL STOKES,              :
MARISA MATARAZZO, VANESSA XUERUB,               :
ROBERT SEIDOR, ANTHONY DELLAVENTURA,            :
GREGORY ROSSOMANDO, ROBERT BUDION,              :
And FRANCESCA ALAIMO                            :
                                                :
                          Defendants.           :

---

I, Arnold Edwards, of full age, being duly sworn, depose and state that:

1.      I am a client of the Plaintiff, Gryphon Holdings, Inc (the "Company"). I reside at

1 Clayton Estates Drive, Saint Louis, Missouri, 63131.

2.      In March 2010, I was contacted via telephone by Greg, (who I understand is the

defendant, Gregory Rossamondo). Greg was in charge of my account with the Company.  He

informed me that he was about to leave the Company with approximately 20 other Company

employees to form a competing business. He asked me if I would follow them to their new

operation.

3.      At first I was concerned and apprehensive about the fact that Greg and so many

other employees were leaving the Company and I took the weekend to think about whether I

would transfer my account.

4.      I thereafter, called the Company and was informed by an employee that several employees had left and my account would be transferred to another sales representative.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

*[signature]*

ARNOLD EDWARDS

Dated:

Sworn to before me this
Date of April 2, 2010

*[signature]*
Notary Public

MARLENE M. RIBAUDO
Notary Public - Notary Seal
STATE OF MISSOURI
St. Louis County
My Commission Expires:  Jan. 21, 2012
Commission # 08476201

# EXHIBIT "D"

**STATE OF NEW YORK**
**SUPREME COURT: COUNTY OF RICHMOND**

---

GRYPHON HOLDINGS, INC.

                      Plaintiff

    vs.

NICOLE DESPOSITO MARSH, GENESIS
RESEARCH, INC., PARAGON INFORMATION
SERVICES, LTD., MICHAEL SCARPACI,
LISA M. ATKINS, MICHELE CLARK, ANNA E.
DORIA, JOANNA L. ERNST, JESSICA
HANDELMAN, LISA GURRIERA,
CHRISTOPHER PERROTTA, PAUL STOKES,
MARISA MATARAZZO, VANESSA XUERUB,
ROBERT SEIDOR, ANTHONY DELLAVENTURA,
GREGORY ROSSOMANDO, ROBERT BUDION,
And FRANCESCA ALAIMO

                      Defendants.

INDEX NO.: 100663/10

**AFFIDAVIT OF**
**SUSAN CUNNINGHAM**

---

I, Susan Cunningham, of full age, being duly sworn, depose and state that:

1.    I am a client of the Plaintiff, Gryphon Holdings, Inc.  I reside at 15 Matawankee Trail, Littleton, Massachusetts 01460.

2.    On or around March 25, 2010, I called the Plaintiff to speak with my account representative, Michael Stern (who I understand is the defendant, Michael Scarpaci ("Scarpaci"). I was informed by an employee of the Plaintiff that he was no longer employed by the Plaintiff and that another representative would be handling my account. Since, I was not happy with Scarpaci's services I was happy to deal with another representative.

3.    Thereafter, on March 30, 2010, I was contacted by Scarpaci's secretary Vanessa who had informed me that Scarpaci formed a competing business and that I would be contacted by him to see if I would transfer my account.  Vanessa further informed me that any money I had sent to the Plaintiff would be honored by Scarpaci.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

*Susan Cunningham*

SUSAN CUNNIGHAM

Dated: April 2, 2010

Sworn to before me this
Date of April 2, 2010

Notary Public